STATE

v.

Richard Alan **FRAZIER.**

No. 78–442–C.A.

Supreme Court of Rhode Island.

Oct. 27, 1980.

Dennis J. Roberts, II, Atty. Gen., James P. Renaldo, Sp. Asst. Atty. Gen., for plaintiff.

John A. MacFadyen, III, Allegra Munson, Mary E. Levesque, Asst. Public Defenders, for defendant.

## OPINION

KELLEHER, Justice.

At about 4 a. m. on December 8, 1977, in the town of Cumberland, Patrolman John Bruno (Bruno), while on routine motor patrol, spotted an "unfamiliar" automobile with two occupants traveling east on John Street. When Bruno noticed that the vehicle lacked a front license plate, he radioed police headquarters to tell his superiors that he was about to stop the car. After stopping the vehicle, Bruno asked the operator for his license and his car registration. The driver was the defendant, Richard Alan Frazier (Frazier). The other front–seat occupant was Frazier's friend, Lynn Gray (Gray).

Bruno's testimony indicated that as he approached the vehicle, he directed his flashlight beam into the back–seat area to assure himself that no one was hiding behind the front seat. As he did so, Bruno observed "an AM/FM tape player, a camera, a case of beer, and * * * a knife

* * * " in plain view on the back seat. The knife was described in the indictment as "a carving knife." Frazier appeared "nervous" and repeatedly asked Bruno why he was being stopped, but he did produce a valid license and registration. Thereupon, Bruno asked Frazier to step out of the car, and as he complied, the patrolman noticed a steak knife protruding from Frazier's back pocket. At this point, a sergeant arrived on the scene, and the occupants were separated and asked to recount the details of their recent activities. Their answers about where they had been and where they were going were mutually inconsistent. After conferring about the conflicting stories and the items seen on the rear seat, Bruno and the sergeant decided to transport Frazier and Gray to the Cumberland police headquarters "for further investigation." The automobile remained, with an officer standing guard, where it had been stopped.

When the duo arrived at headquarters, they were separated, searched, and the contents of their pockets seized. At approximately 4:30 a. m., Bruno telephoned the neighboring communities of Lincoln and Central Falls in order to ascertain whether the articles seen on the back seat might have been implicated in any recent "breaks or incidents." When Bruno called the Central Falls police, he talked to Officer Roland H. Fournier (Fournier).

Earlier, Fournier had been on patrol when, at approximately 3:45 a. m., he received a radio directive to proceed to 34 Watson Street and to investigate a report about a man screaming. When Fournier arrived at the multitenement dwelling located at the designated address, he was told by the first–floor tenant that "there was a man upstairs bound and gagged on the floor." When Fournier and a fellow officer entered the second–floor tenement, they found the tenant, Angelo Rodrigues (Rodrigues), a Colombian immigrant, bound, gagged, and blindfolded.

Rodrigues was freed from his bounds and assisted in composing himself. After an inspection of the premises, the officers be-

came aware, through their use of a minimum of English and an abundance of sign language, that Rodrigues had been robbed. Included in the stolen goods were a camera, a tape recorder, a case of beer, and some cash. Fournier's colleague took Rodrigues to the Pawtucket Memorial Hospital for treatment, and Fournier returned to headquarters where for a short period he assumed the duties of the desk officer.

When Bruno called the Central Falls police, he spoke to Fournier. As soon as Bruno mentioned that one of the suspects had in his possession a "Colombian peso," Fournier asked about the presence of a case of beer, a camera, and a recorder. Within minutes after receiving an affirmative response, Fournier was on his way to Cumberland to bring the "two suspects back to our city for investigation."

Approximately six month later, in early June 1978, Frazier was on trial before a Superior Court jury on a two–count indictment charging him with the crimes of robbery, a violation of G.L. 1956 (1969 Reenactment) § 11–39–1, and assault with a dangerous weapon, to wit, "a carving knife," in a dwelling house with intent to rob, a violation of § 11–5–4. At the trial, Rodrigues told the jury that he had been beaten and robbed by two men whom he had met earlier in the evening of December 7 in a Central Falls bar and whom he had invited to come to his tenement for a sip of Colombian "firewater." Rodrigues insisted that Frazier had confronted him with a carving knife and demanded his cash, and that Frazier then took the knife, cut Rodrigues's pants pocket, and removed his wallet. In his testimony, Frazier conceded that he and Gray had met Rodrigues in the bar and had accepted Rodrigues's invitation for an early–morning potation. Frazier supplied the transportation. He denied any connection with the robbery episode but admitted help-

ing Gray to tie up and blindfold Rodrigues. He explained the presence of the steak knife by telling the jury that after Gray had threatened Rodrigues with the steak knife, he relieved Gray of the knife, put it in his pocket, left the tenement, and returned to his car. According to Frazier, Gray bore the sole responsibility for the back–seat array of goods.

After the trial justice's instructions, the jury returned to the courtroom twice, one to ask the trial justice how one would prove the requisite intent to rob and later for a reading of that portion of Rodrigues's testimony relating to Frazier's cutting of his pants. The trial justice, in denying the motion for a new trial, made it clear that a crucial portion of the prosecution's case consisted of the testimony given by the commanding officer of Cumberland's night patrol. The officer testified that when Frazier arrived at headquarters, one of the items taken from his person was a fountain pen. Earlier in the trial Rodrigues had identified the fountain pen as his.[1]

Although Frazier raises a multitude of issues, the decisive issue relates to the trial justice's denial of Frazier's motion to suppress the evidence initially seized by the Cumberland police and subsequently received by the Central Falls officers. The trial justice rested his denial of the motion to suppress on (1) Frazier's lack of standing, (2) a lawful arrest by the Cumberland police, and (3) language found in G.L. 1956 (1969 Reenactment) § 12–7–1, which in its relevant part states that a police officer "may detain a criminal suspect for investigatory purposes for a period up to two hours."

▆ In ruling on the standing issue, the trial justice relied on our holding in *State v. Jardine*, 110 R.I. 491, 493, 293 A.2d 901, 902 (1972), where we recognized that a proponent of a motion to suppress evidence has

---

1. In his charge, the trial justice told the jury that the robbery count could not be sustained unless the jury believed that Frazier willingly participated in the taking and carrying away of Rodrigues's property. After the trial justice in his supplemental charge had explained that a person's intent was to be determined by what a person says or does, a juror asked, "Would possession * * * be a factor in the case?" The trial justice answered in the affirmative, and subsequently in his denial of the new trial stressed the important part the pen played in Frazier's conviction.

the requisite standing if he had an interest in the "object seized" or in the "place searched." [2] The trial justice observed that even though Frazier produced a valid license and registration, there was no evidence indicating to whom the car belonged or if he had the owner's permission to use the vehicle. The trial justice apparently overlooked Officer Bruno's affirmative response when he was asked if Frazier complied with his request that he produce "his license and registration." This evidence unquestionably indicates that Frazier was the owner of the vehicle and thus had standing to seek suppression of the tangible evidence presented at the trial by the prosecution.

■ The trial justice, in finding that the search could be considered as incidental to a lawful arrest, pointed out that the requisite probable cause for the arrest was the missing license plate. However, it is obvious from the record that the Cumberland authorities had never attempted to justify their custodial arrest of Frazier on the basis of the missing plate. A missing license plate is a "violation" [3] for which a citation [4] would be issued to the operator for subsequent disposition within the framework of the Department of Transportation's Administrative Adjudication Division. No such citation was ever issued. The arrest in this case occurred when Bruno and the sergeant decided to bring Frazier and Gray to the station. Bruno conceded that once the decision was made, Frazier and his companion were no longer at liberty "to leave Elm Street and go on their way."

■ Bruno's admission reminds us that in order to constitute an arrest, the detention of a person need not be accompanied by formal words of arrest or station–house booking. *United States v. Brunson*, 549 F.2d 348, 357 (5th Cir. 1977). Investigatory seizures, such as the taking of Frazier to Cumberland police headquarters, have been held to be arrests for constitutional purposes and consequently require for their legality the existence of probable cause. *Dunaway v. New York*, 442 U.S. 200, 206–15, 99 S.Ct. 2248, 2253–58, 60 L.Ed.2d 824, 832–37 (1979); *State v. Williams*, 412 A.2d 1223, 1224 (Me. 1980); *Commonwealth v. Napolitano*, —— Mass. ——, ——, 393 N.E.2d 338, 344 (1979); *see also State v. White*, N.H., 406 A.2d 291 (1979). In *State v. Firth*, R.I., 418 A.2d 827 (1980), we once again emphasized that the legality of an arrest is to be determined by the existence of probable cause at the time of the arrest and not by what subsequent events may disclose. Again in *Firth* we stressed that the crucial issue was whether at the moment of the arrest the facts and circumstances within the police officer's knowledge and of which he had reasonably trustworthy information were sufficient to warrant a prudent person's believing that the arrestee had committed or was committing an offense. Earlier this term, in *State v. Halstead*, R.I., 414 A.2d 1138 (1980), we pointed out that while a reasonable suspicion might justify a brief investigatory stop of an individual to determine his identity or momentarily to maintain the status quo, we also emphasized that probable cause remains a prerequisite to an arrest.

2. In *State v. Jardine*, 110 R.I. 491, 293 A.2d 901 (1972), the accused was charged with the receipt of stolen goods, to wit, seventy–five men's suits. We rejected his reliance upon the automatic–standing concept conferred on those who are charged with possessory crimes by the holding of *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). Recently, in *State v. Cortellesso*, R.I., 417 A.2d 299, 301 (1980), we noted that in *United States v. Salvucci*, —— U.S. ——, ——, 100 S.Ct. 2547, 2549, 65 L.Ed.2d 619, 623–24 (1980), the Supreme Court expressly overruled the automatic–standing concept. We also noted in *Cortellesso* that standing would now be established

by proof of a legitimate expectation of privacy in either the evidence seized or the property searched.

3. *See* G.L. 1956 (1968 Reenactment) § 31–43–1 (1979 Cum.Supp.).

4. *See* G.L. 1956 (1968 Reenactment) § 31–27–12 (1979 Cum.Supp.). At its January 1978 session, the General Assembly amended § 31–41–4 with its enactment of P.L. 1978, ch. 386, so that the operator of a one–plate automobile incurred a $15 fine that could be mailed to the Administrative Adjudication Division of the Department of Transportation.

■ One of the most important elements in determining whether probable cause existed is satisfied when the police know a crime has actually been committed. In many cases the police do not know that a crime has been committed. When the arrest or search is made when the police do not know that a crime has been committed, more and better evidence is needed to prove that probable cause exists for the arrest than is the case when the police do know that a crime has been committed. *State v. Johnson*, 363 So.2d 684 (La.1978).

■ Applying these principals to the issue at bar, we note that, at the time of Frazier's forced departure to the police station, the Cumberland police were totally unaware that any criminal activities had taken place within their area of responsibility or in any adjacent municipalities, but they were aware of (1) an unfamiliar automobile with a missing license plate, (2) a nervous driver who kept asking why he had been stopped, (3) a back seat that served as a repository for a camera, a tape recorder, a case of beer, and a kitchen knife, (4) a steak knife protruding from the driver's back pocket, and (5) a discrepancy in the stories given by the occupants when asked where they had been and where they were going.

Having in mind that many of the motoring public carry a diversity of objects in the back seats of their automobiles, we believe that the items observed by Bruno in and of themselves were innocuous. *Cf. City of Warwick v. Robalewski*, R.I., 385 A.2d 669 (1978). Frazier's nervous demeanor is meaningless because it would also be shared by most motorists who are stopped at night by a police officer, especially if they are not immediately aware of the purpose of the stop. *See United States v. Buenaventura–Ariza*, 615 F.2d 29 (2d Cir. 1980). The significance of the steak knife is minuscule. It is not an exhibit. Although the conflicting stories might be sufficient to raise one's suspicions, the conflict on this record does not amount to probable cause. An analysis of Bruno's testimony indicates that the decision to take the suspects to headquarters was based upon the back–seat collection and the conflicting versions of the point of departure and the point of destination.

It is our belief that at the time of Frazier's arrest the Cumberland police did not have sufficient evidence that would establish probable cause for the investigatory seizures that we have described. Proof of this conclusion can be found in the testimony given at trial by the captain who was in charge of Cumberland's night patrol. He explained that at the time the call went out to Central Falls, "we couldn't come up with any reason why we should have them [Frazier and Gray] * * * and we were just about ready to let them go * * *." Since the requisite probable cause was not present at the time of the Cumberland arrest, the denial of the motion to suppress was extremely prejudicial, especially in light of the trial justice's observations when he rejected Frazier's motion for a new trial.

The defendant's appeal is sustained, the judgment of conviction appealed from is vacated, and the case is remanded to the Superior Court.

DORIS, J., was present for oral argument but did not participate in the decision.